Case Number 20-1299, Secretary of Labor, Mine Safety and Health Administration, Petitioner v. Knight Hawk Coal, LLC, and Federal Mine Safety and Health Review Commission. Ms. Scott for the petitioner, Mr. Moore for the respondents. Good morning, counsel. Ms. Scott, please proceed when you're ready. Good morning, and may it please the court, Emily Toler-Scott for the secretary. I reserve two minutes for rebuttal, please. Established principles of administrative law support applying arbitrary and capricious review to the secretary's plan suitability determinations. The commission's decision in this case would require this court to contradict not only those principles, but also its decision in Prairie State to use, without any basis, an element of proof to arbitrary and capricious review. The court should reverse the commission's decision and reaffirm that arbitrary and capricious review, that is, genuine arbitrary and capricious review, not the nominal version that the commission applied, applies to MSHA's plan suitability determinations. It's true in this case that the commission said that it applied arbitrary and capricious review to the secretary's decision that Knight Hawk's ventilation plan was not suitable. But saying that the commission was doing something is not the same as actually doing it. And the commission's using the kind of magic words of arbitrary and capricious review doesn't mean that it actually applied that standard correctly. Instead, what the commission did was introduce a new requirement, what it called a proof of plausible harm to arbitrary and capricious review. And that's a legal error for a number of reasons, and it's not appropriate in arbitrary and capricious review. So the first of those is that there's no basis in any of the case law on ventilation plans specifically. Can I ask a threshold question about the review standard? Let's assume that the commission reviews what the secretary did under arbitrary and capricious review, which is what both parties are assuming. Then my question is, what is the standard by which we review the commission's determination that the secretary acted arbitrary and capriciously? And it looks like in the respondents' brief, they indicate that the question for us is whether the finding that the secretary acted in an arbitrary and capricious manner is something we've reviewed for substantial evidence, as opposed to whether we reviewed de novo whether the secretary acted in an arbitrary and capricious manner. And I thought that that's what they're arguing in their brief at page 19. And I didn't see in your reply brief that you thought differently. No, that's correct. I agree that substantial evidence is the standard of review for the commission's finding about whether the secretary acted arbitrarily. But that's distinct from the legal question of whether the commission actually in fact applied arbitrary and capricious review correctly, if that distinction makes sense. I'm not sure it may make sense, but I'm not sure I follow it. And I guess my question is, for our purposes, when we're reviewing what the commission did, are we asking, was the commission right de novo to think that the secretary acted arbitrary and capriciously? Or are we asking, was there substantial evidence supporting the commission's determination that the secretary acted in an arbitrary and capricious manner? And I guess what that gets to is, is the determination that the secretary acted in an arbitrary and capricious manner, is that a question of law that we reviewed de novo? Or is that finding a fact that we review for substantial evidence? What's your view on that? Our view is that that's a substantial evidence question. That's the approach that the court took in Prairie State. So in Prairie State, the court considered first the kind of threshold legal question of what standard of review applies at all de novo. But then considered whether the commission's finding in that case that the secretary did not act arbitrarily was supported by substantial evidence. And I think the same breakdown should apply here. This is less than a question and more an observation. But this system, I'm baffled by it, just like our chief judges. There is a line of cases in our circuit in administrative law that says arbitrary and capricious review is the same as substantial evidence review. And so if you frame it up, it says that, and this is the statute says that the commission has to review the ALJ by a substantial evidence test. And then the judicial review provision of the statute says that we review the commission by a substantial evidence test. So you wind up with a system that says that the ALJ determines whether the secretary has substantial evidence to support. And the commission has to accredit the ALJ by substantial evidence and we have to credit the commission by substantial evidence. It's totally, absolutely bizarre. That's not a question. Well, Judge Randolph, I would just point out one thing. I think the commission's law is generally that ALJs, at least the first instance in most cases, apply a preponderance standard. Now I understand that these plan dispute cases are very different, obviously, from your run-of-the-mill enforcement cases that the commission hears. I'll try to ask a question also because I have the same kind of complex of concerns. It seems there's something a little bit odd about saying that we review a determination as to whether the commission, the secretary acted in an arbitrary and capricious manner for substantial evidence because it indicates that that's a question of fact. Whether the secretary acted in an arbitrary and capricious manner feels to me kind of like a mixed question of law and fact that's ultimately a legal conclusion that the secretary acted in an arbitrary and capricious manner. It seems like that's a legal conclusion that's grounded in facts. Of course, the reviewing body would have to consider the underlying facts to reach the legal assessment of whether there was an arbitrary and capricious deficiency. But it seems a little bit odd to say that we apply substantial evidence to the question of whether the secretary acted in an arbitrary and capricious fashion. But you seem to be buying into that. And I think that makes it harder for you, I think, right? Because, I mean, it would be easier for you if we reviewed that de novo. I'm not necessarily saying that's right or wrong. I'm just saying I'm somewhat puzzled by the questions on this because I don't completely know what the answer is. I apologize if I've sort of muddied these waters and not provided clarity. I think our position was simply that, you know, applying kind of the framework that was applied in Prairie State, the factual findings that the commission made to support its ultimate conclusion of arbitrariness would be reviewed for substantial evidence. That's definitely true. But the determination that the secretary acted in an arbitrary and capricious manner, what standard of review do we apply to that? Because that's what you've put before us. You're saying the commission was wrong to conclude that the secretary acted in an arbitrary and capricious manner. And we could review that de novo. We could just step into the shoes of the commission and say, well, we'll look at what the secretary did and we'll decide de novo whether the secretary acted in an arbitrary and capricious manner and whether the commission was right to conclude that the secretary did. Or we could do something more deferential towards the commission. And we could say, well, actually, we don't review de novo whether the commission was right to conclude that the secretary acted in an arbitrary and capricious manner. We're going to review that deferentially. Maybe we think it's a question of fact as to which we apply substantial evidence review, which is, I think, what the respondent is saying and which I didn't take you to be disputing. But that seems like a steeper climb for you than if we were reviewing it de novo. I agree that it is a somewhat steeper climb. But let me step back to the underlying question. So, yeah, I mean, yes, I think that at least it is, in some respects, a mixed question of law and facts. But at least in resolving this case, I think whatever standard the court applies, the commission's decision can't stand. And this is ultimately because MSHA's decision, I'll use MSHA and the secretary interchangeably here just to try to clear up any confusion. MSHA's decision that this plan was not suitable is eminently reasonable and supported by the evidence that was before MSHA at the time. And this is primarily concerned with two issues. One was the deep perimeter cuts, which were not adequately ventilated. And the other was the inadequate weekly examinations that mine examiners are required to do. So, you know, fundamentally what MSHA found about these deep cuts on the first point is that deep cuts are more difficult to ventilate generally. That's especially true when they are dead ends like they are in this case. These deep cuts in particular were difficult to ventilate because, again, they're dead ends. They're not connected to anything else in the worked out areas. They're unbolted. There are no roof bolts put in the roof, which keeps it from collapsing. So you have these deep cuts, which are inherently more unstable. They're not bolted, so they're even more likely to collapse. And this collapse is one of the things that is most likely to release methane, which of course is one of the sources of catastrophic and fatal mine explosions. So here you have kind of a combination of factors that makes these perimeter cuts exceptionally dangerous. And that's one of the concerns that MSHA had in this case. It was not arbitrary. It was, in fact, eminently reasonable for MSHA to say to Nighthawk, well, you know, you need to tell us how you're going to ventilate these deep cuts. Or alternatively, you can take shorter cuts, you can take 20 foot cuts, or you can, you know, just one of these two is what we need from you. And MSHA didn't get anything from Nighthawk on that, despite, you know, 10 months of asking for it. MSHA didn't get anything from the operator that was going to address those deficiencies. And then the second reason that MSHA was concerned about this plan was, again, the inadequate weekly examinations. So a mine examiner has to, what's called walking the bleeders, essentially a mine examiner has to go through these worked out areas at least once a week and determine, you know, take measures of methane and determine whether the ventilation plan is, in fact, working like it's supposed to. And MSHA found that because there were, or MSHA found that there were a number of deficiencies in this plan that made it not possible for the examiner to really figure out whether that was going on. One is, you know, generally these areas was not controlled. It was sort of in our midst. And again, the point of requiring these exams is to make sure that every part of these worked out areas is ventilated. So you need air to get into each place in this worked out area to ensure that you don't have pockets of methane, because again, those can accumulate and cause explosions. Scott, can I interrupt you? Because I just want to make sure I get my question in the way I view this case. And that is, it has very special circumstances in that this perimeter cut scheme had been approved repeatedly. And the VIMS study, to me, doesn't show any changed circumstance. To me, it's an unusual case in that there have been past approvals. And at least until you point me to what circumstances have changed, there are no changed circumstances. And it was arbitrary and capricious for MSHA and the secretary to say, no, based on the VIMS study alone, I'm not looking at the other bases for the commission, but based on the vague, inconsistent VIMS study, it was arbitrary and capricious to vacate this area. So I'm just wondering, what prompted MSHA to vacate this perimeter cut in view of the past approvals? I don't think it is, Judge Henderson, for a few reasons. So one is that MSHA didn't decide to revisit this plan for no reason at all. What prompted MSHA to go look at this plan again was another mine in the same area, Gateway North, wanted to do something very similar to what this mine was doing. So MSHA, before it approved 40-foot cuts in that case, or at that mine, excuse me, MSHA did a ventilation study there and discovered that those cuts were not being adequately ventilated. And so it was the findings from that ventilation study, essentially, that a very similar plan was not functioning adequately, was not suitable, that prompted MSHA to go look at this mine. And I don't think that was arbitrary because there were so many similarities between the plans and the mines here. Additionally, I don't think that, I don't think that... Was it Gateway, the roof collapse caused by the bolt? I apologize, Judge Henderson, I'm not following the question. All right. What happened in Gateway that made them look at Prairie Eagle? So Gateway had been using a shorter perimeter cuts, but they wanted to begin using 40-foot perimeter cuts, like the cuts that were already being used at Prairie State. So MSHA approved them in that case. MSHA did a ventilation study at Gateway to determine whether those deep cuts could be approved there. So that was the basis for starting this. Now, I would agree that if, you know, you had a plan at a mine that had nothing to do whatsoever with, or was completely dissimilar, I apologize, I see I'm out of time. Go ahead, answer. So if, you know, MSHA had no, if MSHA's only information was from a plan that was completely dissimilar to this mine, had nothing whatsoever to do with the mining conditions or ventilation system that was in use at this mine, that would be one thing. But here, again, MSHA got information about a mine that was using, or proposing to use, rather, proposing to use a very similar plan. And for, you know, those similarities, I think, support the reasonableness of MSHA's decision here to conduct this ventilation study. And just, just one quick final point. You know, the Minot contemplates that MSHA will revisit these ventilation plans. MSHA is required to look at them by statute at least once every six months. Yes, it's true that this had been approved in the past, but that doesn't tie MSHA's hands about, you know, whether it should, whether it has to be approved in the future. And holding that it's arbitrary for MSHA to do that, you know, largely on the basis that it had been approved in the past, I think, would be contrary to the statutory design and would really make it difficult for MSHA to respond to new information about threats to miners' safety and health. Thank you, Ms. Scott. If my colleagues don't have any further questions at this point, we'll hear from Respondents' Council. Mr. Moore. Yes. May it please the Court, I'm R. Henry Moore. I represent Nyhart Coal in this matter. I think it is important to keep in mind when we're talking about this case, leaving aside the fact that this had been repeatedly reviewed and repeatedly approved over the years, is that this is a worked out area. Miners do not enter it after it is mined. And the typical way you evaluate a mined out area is you see what air is going in and what air is coming out. And that was, as Mr. Hasenstab described to the judge, that is exactly what was being done. I thought, I thought, am I wrong? I thought with perimeter mining, that with worked out areas, there's still exposure in a way that there's not with non-perimeter mining. No, I don't believe that's the case. Yes, you can go in because the roof is supported in many of the areas, although not in the perimeter cuts themselves, but you don't normally go in because you've mined it out. You are looking to see if that area is ventilated by checking what goes into the area and what comes out of the area. And that's what they were doing. Now, one of the things about that study that they did, and we have to recognize that all three of the mines that they studied were the only mines doing perimeter mining at that point. Although Gateway North had a predecessor mine, Gateway, that did perimeter mining. However, when you look at that study, there are a couple things that really strike you, which should have struck the district manager. First of all, the methane levels, even in the extended ends of the perimeter cuts, were minimal. A tenth of a percent of methane or less. Those are very good numbers. The other thing that was striking was the oxygen numbers. When you expose coal to air, it begins to oxidize. What happens is it uses up oxygen. If you were not getting an air exchange, as Mr. Hartsog, our expert, described across that workout area, you would be seeing lower levels of oxygen. You were not. What hasn't been mentioned here, of course, is that we're talking about what the district manager considered so far. Well, what he didn't consider was the safety benefits of perimeter mining. Perimeter mining has distinct safety benefits that nobody disputes here. He did not consider them. The judge made a credibility finder when he said, oh, yeah, I thought about them. Well, he didn't even mention them in any of his letters to them. These safety benefits are significant. They are obviously worth considering. We cited the Canyon fuel case involving an escape way and suitability determination where the judge hadn't considered the safety benefits. I interrupted. The The usual situation with an agency decision that is reviewed for arbitrary and capricious is there's some sort of written opinion. But here, the secretary didn't. It wasn't a formal adjudication. Is the rationale, the secretary's entire rationale consists of the letters? Is that it? The letters. And the technical citation that was issued to give the commission jurisdiction. That's it. That's it. It's it's while a ventilation or roof control plan ends up with a something akin to a mandatory standard, which is why it is worthwhile looking at the safety benefits when you are analyzing the plan. Well, let me follow up on that. The is it do you do you read the the correspondence back and forth on the citation as meaning that. Okay. Your ventilation plan was maybe. Okay. But ours is better. No, I don't read it that way. I think I'm I I would like to read it that way in in a sense. But now I'm reading it as they thought ours was bad and shouldn't be used at all. And I don't think that's really should be the case. You know, they permitted Nighthawk to use it for years. They permitted other minds to use it. As Mr. Esslinger, a former 30 year M share employee said, other minds have been using this. It is a very safe method of doing it. Yeah, but an agency, the agency can change its mind. Can it Well, the agency can change its mind, but it has to be reasonable when it does that. And they're one of the things they didn't do here is look at the safety aspects and balance it out. This court over the years, and I know Judge Henderson's been involved in some has dealt with petitions for modifications of mandatory standards. And one of the aspects of those that you look at is whether or not there are safety advantages, irrespective of what the standard provides. And in this particular case, There are distinct safety advantages from a standpoint of avoiding hazards of roof bolting standpoint of respirable dust, which is specifically a purpose of a ventilation plan. Moving equipment and the like. There are significant safety aspects that the district manager just simply ignored. Excuse me. But he, but We look at some other things here, you know, it's not only failure to look at the safety aspects. One of the things he didn't do is talk to his own inspectors this district manager did not Have any experience with perimeter mining. He said he'd been in Nighthawk, but he'd never looked at perimeter mining. He's got a number of inspectors who inspect this mine regularly ventilation specialists and the like. And he never sat them down. And so what do you think of this. His excuse was, well, this wasn't a plan revision. This was a revocation. I find a revocation to be a major form of revision. If you want to know the truth. The excuse is, well, they were part of Mr biters team. Well, I apparently he didn't talk to them. But given how he reacted when he disagreed with one of his subordinates, who was doing smoke tests. I'm not surprised that he didn't talk to them. They didn't talk to those people who we have evidence Supported perimeter mining. We also this is what normally when you have a worked out area. The roof is bad. The atmosphere is bad and you can't go in there and do the sort of thing they did here. But they have techniques to evaluate air flow across a worked out area using tracer gas. Mr biter and I discussed using measuring the pressure drop across the workout area. They didn't use that it would have been really simple to use that. Well, not simple because you have to set up a tracer gas study, but they didn't do that. And this whole thing about the smoke test recognize that what we're talking about. I am standing in a dark mine entry with a cap lamp and out in front of me is a wheel device that wheeled out into the end of the perimeter cut With I think they said to cap lamps on it and I'm sending puffing smoke out there and trying to figure out what it's doing. And what it did was dissipate, which would suggest to me there was some air movement. They also took Bottle samples from that area, which showed the methane was low and the oxygen was good. But if you look at the smoke tube test. They are suspect right from the get go. Can I ask you a question about this, which is, um, is it your view that the Secretary's determination or inches determination. I can't remember who exactly made it, but at the nearby mine. Couldn't Engage in the level of deep cuts that it engaged in suitable that appropriately for purposes of ventilation was also arbitrary and capricious or do you think that there's a difference between the circumstances involved with that mine and yours. Well, there aren't enough of the circumstances on the record, Your Honor, to say, but my gut. My gut feeling is all three studies gateway Viper and Nighthawk are all similarly flawed because of the way they did the studies. One of the things I want to point out is we're talking about 40 foot perimeter cuts. Typical minor cut is 20 feet. I am Nighthawk would have had as Undoubtedly gateway and Viper would have had the ability to take 40 foot cuts that were not perimeter cuts and when you evaluate for perimeter for 40 foot cuts. You evaluate the ventilation at the end because what you're doing is taking your continuous minor and mining for 40 feet. Well, it's a dead end, no matter what, until you make air connections, but because it's a dead end when you are approving those You actually do a ventilation study to see if it's ventilated properly at the end. You can see in the history of the ventilation plans here. That The district. Views getting a 40 foot cut non perimeter as a step by step process that was true in the Prairie State case that was before this court also earlier. That you, you have to go and prove that you can mind 20 feet 30 feet and 40 feet. There was a Comment also that you could have a roof fall. Which would obviously there are two types of liberation. One is, you know, sort of sudden outburst. And then second is a Generalized liberation. We obviously didn't have generalized liberation in this workout area because you met a would have been at the level. Even if you had some roof liberate methane, which there was no indication that had been happened in this area, you still don't have an ignition source. Mr Hartsog testified that there was no ignition source in the perimeter cuts. You don't have the right type type of rock. They're not bolded so you don't have that argument, which is because sometimes they've argued that roof bolts can spark, but that is not the case sufficiently to ignite methane, as I understand it, but You don't have the potential here that the the secretary and the district manager did a parade of horribles that simply didn't apply to this area to this mind. And one of the things that Theoretically mine plans are supposed to be mine specific and in this case. The Mine specific nature very low methane. There are other factors that are you can look at here and that one of the things is these panels of rooms that where they were doing perimeter mining have about a 11 month life because what they do is they mind the rooms and mine up 600 feet. And then come back and seal off the area. Which means they stop ventilation, but they also don't ever go back in there again. Kind of a fundamental question that You say that that miners don't go into this into these worked out areas. Is that correct, that's correct. Okay, so who cares whether blows up or not. Well, Okay. You care about that. The inspectors Well, the inspect the inspectors don't go in there either. Judge Once you've minded out And you are only inspecting the perimeter, the bleeder area. If you had a mind that was susceptible to methane accumulations, which this mine obviously isn't You could have a methane ignition that would propagate out of this area, but you simply don't have either the ignition source because you have no electricity left in there. And you don't have the ignition sources from any other source, but You can theoretically have an explosion that propagates out of a worked out area, but it in this circumstance. The methane isn't there. All of the the instances in which miners have been injured by methane explosions were ones where they all ones in which the miners were in the area. Yeah. I'm running through my mind. Generally, yes, because I'm thinking of like Our big branch. The miners were on the long wall face Willow Creek. The miners were on a long wall face. But there are varying circumstances over the years, but usually Well, let me ask you if I could. Mr. Moore. You said the inspectors don't go in. Of course, after it's sealed, but does the record show The length of time between when the perimeter cuts are finished and when that worked out area is sealed where the when the inspectors would go in and Let me sort of answer in two parts. Once it's sealed. They don't go in and it was about an 11 month period from the time they started one of these groups of rooms to the period when they would be seal. The inspectors, even before it's seal when there is active mining because they mine a Group of rooms to each side and and continue in that way. They don't go into the area that's been worked out and already mine. They visit the active mining area and they were inspect the bleeder entries around this worked out area, they would not go into the work that area. In fact, there is some testimony that This was barricaded off so that they couldn't get into the work that area and there's nothing going on there. So there really isn't any reason for them to go. They go, frankly, where the miners are working. Okay, but we don't know how long a period of time between The between the Working out of the area and the ceiling of it. It's less than 11 months. Okay. Is that in the record. Yes. Okay, Mr. Hasselstock talked about it. Okay. But there is just to clarify, pick up on what just Henderson is asking you. There is a difference between perimeter mining and non perimeter mining in that there's a period during which with perimeter mining worked out areas remain accessible and not sealed right they ultimately get sealed. But the if we were not to perimeter mine around each one of these rooms, it would still be a worked out area. And the only place on that group of entries that you would go in, is the bleeders around it to check that the air was moving across. You would not go into the worked out area, even if there were no perimeter mining. There is no reason to go into that area where there is no mining and mining is finished. Okay. My colleagues don't have further questions for you. Mr Moore. So, I do have one. So, does that, does that mean that the worked out area. It's not possible to have a methane leak that Either originates there or flows there. I won't say it's not possible, but it is Not likely the active mining, which is where if you were going to have methane liberated in any way is further in by further away from this worked out area. And you are you are checking the air coming out of the working where they're actually mining coal on a regular basis and there are fairly low limits. So it is unlikely you would be getting methane there into this area. Thank you. But just to finish out this thought, but the Secretary found that with the worked out areas and perimeter mining. There is the possibility of methane in those areas. Right. I think you just think that was wrong or do Well, I when you use the word possibility, Your Honor. You know, probably anything is possible, but it is not likely. And that's what the testimony was. And actually what the district manager should have known that it was wasn't likely Because they monitor the methane at the mine every quarter they evaluate all the methane coming out of the mine at the fan. So they know what's going on. Okay. If my colleagues don't have further questions. Thank you, Mr. Moore. Ms. Scott will give you the two minutes you asked for for rebuttal. Thank you, Your Honor. Just a few points to make. Judge Randolph, you asked one question about what the record on review is here. Given how the technical citation process works, you know, I think NYHAWK wants to have it both ways. It gets to testify at the hearing. Secretary only gets to rest on, you know, the letters that it sends. So given How this process works, given that there was a commission hearing, the Secretary's explanations provided at the hearing are also part of the agency record that are on review. And second, and this is the broader point. Well, was it the Secretary's position that even though the ventilation plan that the company proposed would have been sufficient that the Secretary demanded more? The Secretary's position was that this plan that was revoked was not suitable for the five reasons that were outlined in the technical citation. That it was not adequate. That's correct. Okay. And the broader point that I want to make here is is picking up on what Judge Sweeney-Rawson just asked, which is that, you know, fundamentally, this case is about the commission simply disagreeing with the conclusions that the Secretary reached. The question, though, on arbitrary and capricious review is, you know, did the Secretary make findings that consider the relevant factors? Did the Secretary provide an explanation? And as long as that wasn't so inherently unreasonable that it can't possibly be the product of agency expertise, then it really should be affirmed on arbitrary and capricious review. And the commission's decision misses that point. Most of the points that NIHOC has made, they miss that point completely as well. And that's the fundamental problem with the commission's decision here is that MSHA, the Secretary, makes these policy calls about whether the plan is suitable. And that's committed to the Secretary by the Mine Act, by his role in the Mine Act split enforcement scheme, and the commission's decision to the contrary should be set aside. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Randolph